**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**DEBRA ANN SPURLOCK,**

       **Plaintiff,**

**vs.**                              **Case No. 5:09cv311-RS/WCS**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

       **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

This is a social security case referred to me for a report and recommendation

pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D). It is recommended that the

decision of the Commissioner be affirmed in part and reversed in part and remanded.

**Procedural status of the case**

Plaintiff, Debra Ann Spurlock, applied for disability insurance benefits and

supplemental security income benefits. Her last date of insured status for disability

benefits was December 31, 2005. Plaintiff alleges disability due to Hepatitis C, chronic

obstructive pulmonary disease, lumbar disc disease, three surgeries to her right knee,

diabetes, and obesity, with onset on May 1, 2002.  Plaintiff was 50 years old at the time

of the administrative hearing (on May 7, 2008), has a 12th grade equivalency education,

and has past relevant work as a retail store clerk assistant manager.  The

Administrative Law Judge found that Plaintiff has the residual functional capacity to do a

limited range of light work, can perform her past relevant work as a retail store clerk

assistant manager, and thus is not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by

substantial evidence in the record and premised upon correct legal principles.  Chester

v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a

scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable

person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler,

703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d

1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if

supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir.

2002).

> A "substantial evidence" standard, however, does not permit a court to
> uphold the Secretary's decision by referring only to those parts of the
> record which support the ALJ.  A reviewing court must view the entire
> record and take account of evidence in the record which detracts from the
> evidence relied on by the ALJ.

Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983).

A disability is defined as a physical or mental impairment of such severity that the

claimant is not only unable to do past relevant work, "but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122 S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.  A positive finding at step three results in approval of the application for benefits.  At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.  If the claimant carries this burden, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Medical evidence**[1]

Plaintiff had arthroscopic surgery for a torn meniscus on her right knee on August

7, 1997.  R. 738.  She had had two more knee surgeries, both in 1999.  R. 729.

On October 8, 2002, Plaintiff was treated for chest pain and anxiety by John

Spence, M.D.  R. 735.  Xanax[2] was prescribed.

On January 17, 2003, Plaintiff had a laparoscopic cholecystectomy for removal of

gallstones.  R. 728.

On July 20, 2004, Plaintiff began treatment by Mark Akerson, M.D., of Panhandle

Family Care Associates, Inc.  R. 342.  She weighed 201 pounds, which was 59 pounds

overweight.  *Id*.  She complained of a cough, shortness of breath, and stress because

her daughter was "leaving."  *Id*.  Dr. Akerson noted that Plaintiff had rhonchi on chest

---

[1] Descriptions of the purpose and effects of prescribed drugs are from PHYSICIANS' DESK REFERENCE, as available to the court on Westlaw, or PDRhealth™, PHYSICIANS DESKTOP REFERENCE, found at < http://www.pdrhealth.com/drugs/drugs-index.aspx >. Information about medical terms and prescription drugs come from DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS, available at:  http://www.mercksource.com (Medical Dictionary link) or MEDLINE PLUS, found at www.nlm.nih.gov/medlineplus/mplusdictionary.htm.  Social Security Rulings can be found at:  http://www.ssa.gov/OP_Home/rulings/rulfind1.html.    The pages at these websites are not attached to this report and recommendation as the information is relatively well-settled, the precise definitions are not at issue in this case, and the definitions are not likely to be in dispute.

[2] Xanax is a tranquilizer used in the short-term relief of symptoms of anxiety or the treatment of anxiety disorders. Anxiety associated with depression is also responsive to Xanax.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

auscultation,[3] but her respiratory effort was normal.  R. 343.  He found her mental status

to be normal, but he also said that she seemed depressed and sad.  *Id.*  His diagnosis

was acute bronchitis, diabetes, and depression.  *Id.*  He prescribed Zithromax

(antibiotic), Robitussin with codeine, and increased the dosage of Zoloft.[4]  Plaintiff was

also still taking Xanax and Glucophage.[5]  *Id.*

On July 27, 2004, Dr. Akerson found that Plaintiff had atypical pneumonia.  R.

344.  She was wheezing throughout all lung fields.  *Id.*  An Albuterol[6] nebulizer was

prescribed.  *Id.*

On August 3, 2004, Plaintiff saw Dr. Akerson for elevated blood sugars.  R. 345.

He found that she had no breathing problems.  *Id.* and R. 346.  His diagnosis was

uncontrolled diabetes.  R. 346.

On August 18, 2004, Plaintiff saw Dr. Akerson for chest discomfort and she was

"not feeling well."  R. 347.  Dr. Akerson found that Plaintiff had no breathing problem

and her chest auscultation was clear.  *Id.*  Dr. Akerson's diagnosis, however, was

chronic bronchitis and Hepatitis C.  *Id.*

---

[3] Auscultation is listening to sounds arising within organs (as the lungs or heart) as an aid to diagnosis and treatment.  MEDLINE PLUS (MERRIAM-WEBSTER).

[4] Zoloft is prescribed for major depression – a persistently low mood that interferes with everyday living.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[5] Glucophage and Glucophage XR are used to treat type 2 diabetes. Regular Glucophage tablets are taken two or three times daily. The extended-release form, Glucophage XR, is available for once-daily dosing.  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[6] Albuterol Sulfate is prescribed for bronchial spasms and used to treat asthma. PDRhealth™, PHYSICIANS DESKTOP REFERENCE .

On September 23, 2004, a gastroenterology follow-up reported that Plaintiff was diagnosed with Hepatitis C by lab work on August 21, 2004, and August 30, 2004. R. 743. Plaintiff was having abdominal pain, nausea, diarrhea, and dyspepsia. R. 744. The plan was to start treatment with Interferon. *Id.*

On October 9, 2004, Plaintiff had chest pain, but an EKG was normal. R. 726. A chest x-ray revealed chronic lung changes with the possibility of diffuse airway disease. R. 727.

Plaintiff went to the emergency room for chest pain on October 14, 2004, but the findings were normal. R. 721. Plaintiff saw Dr. Akerson on the same day, and said she was feeling awful from taking Interferon. R. 685. She was nauseous and had a fever. *Id.* Phenergan was prescribed for nausea. R. 686.

Plaintiff saw Dr. Akerson on November 4, 2004, with a complaint of sores in her mouth, migraine headaches, and inability to sleep due to pain. R. 686. The diagnosis was apthous [sic, aphthous] ulcers, muscle spasm, migraine headache, and sleeping difficulty. R. 687. Fioricet with codeine was prescribed for the headaches and Ambien[7] for insomnia. *Id.* It was noted that Plaintiff was having a lot of flu-like symptoms from Interferon. *Id.*

Plaintiff went to the emergency room again on November 19, 2004. R. 704. The diagnosis was an acute exacerbation of chronic costochondritis.[8] R. 705. She also saw

---

[7] Ambien is used for short term treatment of insomnia. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[8] Costochondritis is an inflammation of a rib or the cartilage connecting a rib. This is a common cause of chest pain. Inflammation or injury involving the chest muscles is another common cause of chest pain. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE

Dr. Akerson on that day with a sore throat, migraines, and depression. R. 688. Her

breathing was clear and normal. *Id.* Dr. Akerson started Combivent and Trazodone,[9]

increased Zoloft, and increased Dilaudid[10] for pain. R. 689. On November 23, 2004,

Dr. Akerson said that Plaintiff was having "every side effect known with interferon and

[ribarvirin]."[11] R. 690. His assessment was weakness, costochondritis, adverse drug

reaction, and severe depression. *Id.* After a long discussion with Plaintiff, the treatment

for Hepatitis was discontinued. *Id.* A Medrol dose pack[12] was prescribed for

costochondritis and shortness of breath. *Id.*

On December 17, 2004, Plaintiff told Dr. Akerson that she was still having

"severe back, muscle pain." R. 359. He said she had shortness of breath. *Id.* He

found that she had limited range of motion of her spine, with pain on movement. *Id.* He

scheduled an MRI of her lumbar spine. R. 360.

On December 20, 2004, Plaintiff was examined on a consultative basis by Sam

Banner, M.D. R. 664. Plaintiff complained of diabetes mellitus, lung disorder, right

knee injury, and Hepatitis C. *Id.* Plaintiff said that the drugs prescribed to treat

---

CONSUMERS.

[9] Trazodone hydrochloride, sold as Desyrel, is an antidepressant. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[10] Dilaudid is a trademark for a preparation of hydromorphone. MEDLINE PLUS (MERRIAM-WEBSTER).

[11] Ribarvirin is a synthetic broad-spectrum antiviral drug. MEDLINE PLUS (MERRIAM-WEBSTER).

[12] Medrol is Methylprednisolone, a derivative of prednisolone, which is used as an anti-inflammatory agent. PHYSICIANS' DESK REFERENCE (2005).

Hepatitis C had caused pulmonary problems.  *Id.*  She said that she had difficulty

walking and performing daily tasks due to shortness of breath, right knee pain, and

decreased flexibility.  *Id.*  She also complained that she was fatigued easily.  *Id.*  She

had stopped smoking two years earlier, but had smoked a pack a day for 30 years prior

to that.  *Id.*  On review of systems, Dr. Banner placed a question mark as to whether

Plaintiff had a lung problem with shortness of breath.  *Id.*  Plaintiff weighed 212 pounds.

*Id.*  He found that she paused for "every other word due to extreme shortness of

breath."  R. 665.  On examination, he found that her neck had 30 degrees flexion and

extension, 40 degrees lateral flexion, and 90 degrees rotation.  *Id.*  No muscle spasms

in the neck were detected.  *Id.*  Plaintiff's lungs were clear to auscultation, and her

expiratory phase appeared to be normal.  *Id.*  Plaintiff's back had no spasm, and she

had normal range of motion.  R. 666.  She had no pain getting on and off the table.  *Id.*

He found that Plaintiff was unable to perform a squat or heel and toe walk due to knee

instability.  *Id.*  She had full strength in all muscle groups of her upper and lower

extremities, and normal grip strength.  R. 667.  She had diminished reflexes.  *Id.*

Seated leg raising was negative for both legs.  *Id.*  Dr. Banner found no atrophy of any

muscle group, and muscle tone was normal.  *Id.*  Plaintiff had normal ability to do fine

and gross motions with her hands and fingers.  *Id.*  Dr. Banner's diagnosis was Hepatitis

C, Diabetes Mellitus, right knee injury after three operations, but he questioned whether

Plaintiff had any pulmonary disorder (severe shortness of breath).  *Id.*  He said that

Plaintiff would need long term medical care.  *Id.*

On December 27, 2004, Plaintiff was examined by Robin O'Hearn, Ph.D., for a mental status evaluation. R. 657. Plaintiff related that she had sought treatment for depression and anxiety about two years earlier, and her treatment had been limited to medications, Zoloft and Xanax. *Id.* Plaintiff reported that she had daily sleep disturbance, very low energy, fleeting thoughts of suicide, weekly panic attacks, and impaired memory and concentration due to pain and "getting upset about things." *Id.* Plaintiff reported that she took Dilaudid, Prednisone, Insulin shots, Zoloft, Xanax, Avandia, Aciphex, Phenergan, and Trazodone. *Id.* Dr. O'Hearn observed that Plaintiff walked with a noticeable limp, moved slowly, spoke haltingly, and was short of breath. R. 658. Her mood was found to be depressed and lethargic. *Id.* After testing, Dr. O'Hearn found that Plaintiff's concentration, attention, and remote memory were unimpaired, but her immediate short term memory and her capacity for abstract thinking were only fair. *Id.* She said that Plaintiff's judgment was intact. *Id.* Plaintiff reported that she was unable to perform routine activities such as bathing, dressing, or preparing meals, and that she needed a shower chair and assistance to take a shower. R. 659. Her son helped administer the insulin because her hands shook too much. *Id.* She had stayed with her father the night before the appointment "to be able to drive to the appointment today." *Id.* Dr. O'Hearn concluded that Plaintiff's depression and anxiety appeared to be "largely secondary to serious medical problems and pain," and that her physician would have to assess her medical complaints. *Id.* Dr. O'Hearn's diagnosis was major depressive disorder, severe, without psychotic features, and anxiety disorder, NOS. *Id.*

On December 30, 2004, Plaintiff had an MRI of her lower (lumbar and lower thoracic) spine. R. 611. Mild spondylosis was found throughout. *Id.* The impression was that Plaintiff had:

> Disc degeneration to a variable degree throughout her lumbar and lower thoracic spine. Mildly bulging disc material is present at L4-5 and L5-S1 with the disc material slightly asymmetric to the left of midline at L5-S1 and slightly posteriorly displaces the left S1 nerve root without impingement. The disc material at L5-5 is slightly more prominent posterolaterally [sic] on the left as well. No focal disc abnormality or nerve root impingement is seen.

R. 610.

On January 18, 2005, Dr. Akerson noted that the MRI showed that Plaintiff had "lumbar disk disease," but Plaintiff did not want a referral to a specialist. R. 362. The actual findings from the MRI are not in this record. Plaintiff had pain on back flexion. *Id.* Plaintiff weighed 213 pounds and was 71 pounds over weight. *Id.*

On February 13, 2005, Plaintiff had an MRI of her brain. R. 615. The results were normal. *Id.*

On February 17, 2005, Dr. Akerson's diagnosis was acute bronchitis and depression. R. 366. On March 16, 2005, the diagnosis was bronchospasm and acute bronchitis. R. 367. On March 24, 2005, the diagnosis was diabetes mellitus, pulmonary interstitial fibrosis, and Hepatitis C. R. 368. On April 21, 2005, Plaintiff weighed 221 pounds. R. 370. She had no breathing problem. R. 371. Dr. Akerson's diagnosis was dyspnea, hypertension, and edema in the legs. *Id.* On April 26, 2005, it was noted that Plaintiff had been referred for pain management. *Id.*

On May 26, 2005, Dr. Akerson's assessment was insomnia and anxiety. R. 372. Plaintiff had no breathing problems. *Id.* On June 28, 2005, Plaintiff complained of a cough, shortness of breath, a fever, and severe depression due to fatigue from shortness of breath and uncontrolled pain. R. 373. Dr. Akerson said that Plaintiff's blood pressure was doing well and her diabetes was well controlled with insulin. *Id.* Dr. Akerson found that Plaintiff's respiratory effort was normal, and chest auscultation was clear. *Id.*

On July 13, 2005, Plaintiff told Dr. Akerson that she was "worse," and was having bad headaches, was coughing a lot, and was short of breath. R. 374. She told Dr. Akerson that her blood sugars had been doing "ok" but she had recently had a lot of fluctuations in the range of 80 to 280. *Id.* He found decreased breath sounds on chest auscultation. *Id.* His assessment was dyspnea and Hepatitis C. R. 375.

On August 25, 2005, Plaintiff said that she had a flare of Hepatitis. R. 375. She was getting lows and highs with her blood sugars. *Id.* She said she was forgetful and irritable. R. 376. Dr. Akerson found that Plaintiff's chest was clear to auscultation bilaterally. *Id.* Dr. Akerson noted that Plaintiff needed a Hepatitis C titer. *Id.*

On September 26, 2005, Plaintiff told Dr. Akerson that she did not feel well. R. 377. She said that she had shortness of breath, a nonproductive cough, nausea, vomiting, diarrhea, pain in her right lower leg and lower back that was 9 to 10 on a scale of 10, weakness, difficulty ambulating, depression, decreased energy. *Id.* On examination, Dr. Akerson found that Plaintiff had back pain with flexion, but her chest was clear to auscultation; Plaintiff seemed to be depressed. *Id.* A blood test on

September 28, 2005, showed glucose at 190, and Dr. Akerson increased Plaintiff's insulin. R. 378. He noted that Plaintiff was "severely disabled secondary to the above," and said that Plaintiff needed a referral for chronic back pain management. *Id.*

On September 26, 2005, Dr. Akerson completed a physical capacities evaluation. R. 277. He said that Plaintiff could not carry weight of up to five pounds occasionally, or one pound frequently, and could not sit, stand, or walk at all during a workday. *Id.* He said Plaintiff could not walk 150 yards. *Id.* He said that Plaintiff could never push, pull, climb, bend, reach, or work around hazardous machinery. *Id.*

Dr. Akerson also completed a "clinical assessment of pain" on September 26, 2005. R. 773. He said that Plaintiff suffers intractable, virtually incapacitating pain. *Id.* Dr. Akerson thought that physical activity would cause such an increase of pain for Plaintiff that she would need bed rest and medication, and he thought that Plaintiff would be totally unable to function at productive work due to side effects of medication. *Id.*

Dr. Akerson also completed a medical source assessment of Plaintiff's mental status (a checklist) on September 16, 2005. R. 279. Category 4 was defined as being distracted from job activity for more than 20% of a workday or work week. *Id.* Dr. Akerson assigned category 4 to Plaintiff's ability to understand and remember detailed instructions, maintain attention and concentration for extended periods of time, sustain ordinary routine without special supervision, accept instructions and respond appropriately to criticism from supervisors, to be aware of normal hazards and take appropriate precautions, and to travel in unfamiliar places and use public transportation.

R. 279-280.  He said that Plaintiff was completely unable able to perform the following functions of a job: carry out detailed instructions, perform activities within a schedule and maintain regular attendance, complete a normal workday or week without psychological interruptions and to perform at a consistent pace, and to set realistic goals and make plans independently of others.  R. 279-280.

On October 11, 2005, Dr. Akerson's assessment was early pyelonephritis.[13]  On November 3, 2005, Dr. Akerson found Plaintiff's breathing to be normal, not labored.  R. 381.  She had pain over her right chest, and his assessment was costochondritis, pulmonary fibrosis, and anxiety.  *Id.*

On November 10, 2005, Plaintiff said she had no joint or back pain.  R. 382.  She had numbness in her feet.  *Id.*  Dr. Akerson's diagnosis was diabetes mellitus with neuropathy, edema in the legs, and anxiety.  R. 383.  He started Plaintiff on Neurontin[14] for the diabetic neuropathy.  *Id.*

On December 7, 2005, Plaintiff told Dr. Akerson that her fasting blood sugar was over 500 at night and she was having difficulty with processing thoughts.  R. 383.  Dr. Akerson found that her blood sugar was 220 that day.  R. 384.  She was to return the

---

[13] Pyelonephritis is inflammation of both the parenchyma of a kidney and the lining of its renal pelvis especially due to bacterial infection.  MEDLINE PLUS (MERRIAM-WEBSTER).

[14] Neurontin has two uses.  First, it may be prescribed with other medications to treat partial seizures (the type in which symptoms are limited).  It can be used whether or not the seizures eventually become general and result in loss of consciousness.  Second, it can be used to relieve the burning nerve pain that sometimes persists for months or even years after an attack of shingles (herpes zoster).  PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

next day.  *Id.*  On the next day, Dr. Akerson's diagnosis was uncontrolled diabetes,

weakness, and active Hepatitis C.  R. 385.

On January 4, 2006, Dr. Banner performed another consultative examination.  R.

573.  She weighed 210 pounds.  R. 574.  Dr. Banner determined that Plaintiff could flex

and extend her neck 30 degrees, flex laterally 40 degrees, and rotate 60 degrees, which

appears to be a normal range.  *Id.*  There was no muscle spasm with these movements.

*Id.*  Her chest was clear to auscultation, and her expiratory phase appeared to be

normal.  *Id.*  Plaintiff was able to bend forward 80 degrees, backward 30 degrees, rotate

30 degrees, and bilaterally flexion was 30 degrees laterally, all of which seems

indicative of a lack of impairment in her back.  R. 575.  She limped on her right leg and

could only do a minimal squat, consistent with her right knee injury.  *Id.*  Tandem heel

and toe was performed satisfactorily.  *Id.*  Plaintiff had difficulty getting on and off the

table, which would be consistent with her weight.  *Id.*  Plaintiff was weak (3/5) in her

right lower extremity due to pain, again consistent with her knee injury, but had no

weakness in her left lower extremity.  R. 576.  Seated leg raise caused right knee pain.

*Id.*  Her reflexes were diminished (2/4) throughout.  *Id.*  Plaintiff had no atrophy in any

muscle group in the upper or lower extremities, and her muscle tone was normal.  *Id.*

Fine and gross manipulation was satisfactory in both hands, and she could button

clothing without difficulty.  *Id.*  Dr. Banner concluded that Plaintiff would need long term

care, she gave good effort during the examination, and a psychiatric evaluation was

needed.  *Id.*

On January 5, 2006, Plaintiff again saw Dr. Akerson. R. 386. According to Dr. Akerson she had congestion and had had seven teeth pulled. R. 387.

On February 7, 2006, Plaintiff told Dr. Akerson that she had numbness and swelling bilaterally in her hands, with tingling in her fingers. R. 388. She was anxious about a visit to Shands and wanted closure on her treatment for Hepatitis C. *Id.* It was noted that Plaintiff had a history of pulmonary pneumonitis caused by treatment with Interferon. *Id.* Dr. Akerson said her blood sugar was stable on insulin. *Id.* He found cervical spinal tenderness and limited range of motion of the neck on examination, and referred Plaintiff for an MRI of the cervical spine, with considerations for an EMG[15] if Plaintiff's condition did not improve. *Id.* He increased the dosage of Neurontin. *Id.*

On February 14, 2006, Plaintiff returned to Dr. Akerson. R. 389. She complained of chest congestion but on examination, her respiratory effort was not labored and there were no wheezes or rhonchi. *Id.*

On March 24, 2006, Dr. Akerson found that Neurontin was causing an elevation of Plaintiff's blood sugar, and Plaintiff said her blood sugar was 409. R. 390. Plaintiff said that her depression was "bad" and her legs hurt. *Id.* Dr. Akerson's diagnosis was uncontrolled diabetes, diabetic neuropathy, depression, and active Hepatitis C. R. 391. He said that Plaintiff seemed to be sad, slowed, and depressed. *Id.* He prescribed

---

[15] An EMG is an electromyogram. Electromyography is an electrodiagnostic technique for recording the extracellular activity of skeletal muscles at rest, during voluntary contractions, and during electrical stimulation. DORLAND'S MEDICAL DICTIONARY FOR HEALTHCARE CONSUMERS.

Cymbalta[16] and planned to wean Plaintiff from Wellbutrin.[17]  *Id.*  Dr. Akerson warned

Plaintiff "about worsening symptoms of depression."  *Id.*

On March 30, 2006, Plaintiff said to Dr. Akerson that she was tired and wanted to

sleep all of the time, and had been sleeping a lot since starting Lyrica[18] and Cymbalta.

R. 392.  Dr. Akerson noted that she seemed depressed.  *Id.*

On April 17, 2006, Plaintiff told Dr. Akerson that she had been feeling bad all

weekend.  R. 393.  She had a sore throat and said that she was "severely depressed."

*Id.*  She felt as though she was falling apart.  *Id.*  She seemed depressed to Dr.

Akerson.  *Id.*  He continued the diagnoses of diabetes with neuropathy and Hepatitis C.

*Id.*  He recommended that Plaintiff "get into counseling for severe depression."  R. 394.

On May 2, 2006, Plaintiff told Dr. Akerson that she had had a migraine for

several days, with photophobia and pain with loud noises.  R. 394.  Her blood sugar

levels were doing well.  *Id.*

---

[16] Cymbalta is used to treat major depression and diabetic neuropathy, a painful nerve disorder associated with diabetes that affects the hands, legs, and feet. Cymbalta is also used to treat generalized anxiety disorder and fibromyalgia. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

[17] Wellbutrin is indicated for treatment of depression.  PHYSICIANS' DESK REFERENCE (2005).

[18] Lyrica is used in patients 18 years of age and older with nerve pain called diabetic neuropathy, postherpetic infection nerve pain, fibromyalgia (a condition in which there is widespread pain in the muscles and soft tissues surrounding the joints throughout the body), and in combination with other medications to reduce the incidence of seizures. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

On June 7, 2006, Plaintiff complained to Dr. Akerson of chest discomfort and pain in her hips, back, and legs. R. 396. On examination, Plaintiff had pain in her right leg on palpation and movement. *Id.* Dr. Akerson added a diagnosis of pleurisy. *Id.*

On July 6, 2006, Plaintiff returned to Dr. Akerson for depression, anxiety, and Hepatitis C. R. 398. She was to see a lung specialist in the next week, and she was "still quite short of breath." *Id.* Plaintiff reported her "diabetes up to 250 during the day." *Id.* On examination, Plaintiff seemed to be depressed. *Id.* Dr. Akerson increased the dosage of insulin and Cymbalta. R. 399. He encouraged Plaintiff to "save money so we can get into pain management" and to keep her appointment with a pulmonologist in the next week. *Id.*

Plaintiff did not see Dr. Akerson again for over six months, until January 31, 2007. R. 399. She had twisted her foot and had chest congestion. *Id.* He found that she had acute bronchitis. R. 400. Vicoprofen[19] was prescribed. *Id.*

Plaintiff returned to Dr. Akerson on June 27, 2007, five months later. R. 400. She had chest congestion, fever, was "very short of breath," and had pain in her chest. *Id.* He noted rhonchi and bilateral wheezing on chest auscultation. *Id.* Acute bronchitis, diabetes mellitus, and Hepatitis C were among the diagnoses. *Id.*

On July 13, 2007, Plaintiff was seen at the Life Management Center for mental health treatment. R. 475. She was not found to have any impairment of

---

[19] Vicoprofen is a chemical cousin of the well-known painkiller Vicodin. Both products contain the prescription pain medication hydrocodone. However, while Vicodin also includes acetaminophen (the active ingredient in Tylenol), Vicoprofen replaces it with ibuprofen (the active ingredient in Advil). Vicoprofen relieves acute pain. It is generally prescribed for less than 10 days, and cannot be used in the long-term treatment of osteoarthritis or rheumatoid arthritis. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

consciousness.  R. 477.  She was markedly depressed and somewhat anxious.  *Id.*  Her

remote memory was markedly impaired.  R. 478.  It was recommended that she attend

individual counseling and then transition to group therapy.  R. 480.  The diagnosis was

mood disorder due to medical condition (Hepatitis C).  R. 481.  A current Global

Assessment of Functioning (GAF) score of 50 was assigned.[20]

On August 8, 2007, Plaintiff was seen in the Jackson Hospital by Jirayos

Chintanadilok, M.D.  R. 460.  Dr. Akerson said that she had come to the hospital due to

acute onset of chest pain.  R. 455.  While her oxygen saturation was 93 to 95% on room

air, she was very short of breath on exertion.  *Id.*  Dr. Chintanadilok thought that

Plaintiff's condition was "mostly due to costochondritis +/- pleurisy with potential viral

infection."  *Id.*  Dr. Chintanadilok determined that Plaintiff's lungs were clear, she was

alert and oriented, her motor "grade" was 5/5, her sensory was intact, she had

tenderness at the parasternal area on the left side, her chest x-ray was negative, and

her oxygen saturation with room air on that day was 97%.  R. 460.

---

[20] "The GAF scale reports a "clinician's assessment of the individual's overall level of functioning."  *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)."  Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

> GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Manual at 34.  GAF scores of 51-60 indicate "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).

On January 15, 2008, Plaintiff was seen by George L. Horvat, Ph.D., for a consultative psychological evaluation.  R. 418-421.  Dr. Horvat made reference to the "Life Management report" dated July 13, 2007, discussed above, in which there was a diagnosis of mood disorder due to Hepatitis C and GAF score of 50.  Plaintiff reported that she weighed 182 pounds, a weight loss of 20-30 pounds from the weights in Dr. Akerson's records.  *Id.*  It was noted that Plaintiff's eye contact was normal, but her facial expression was depressed.  *Id.*  She reported a history of treatment for mental health issues by Life Management of Marianna, Florida, and she said that she had been treated for depression for four years.  *Id.*  Plaintiff said that she spontaneously cried a lot and had lost interest in her prior activities.  R. 419.

On examination, Dr. Horvat found that Plaintiff's attention was distractible and that her anxiety "interfered with her concentration."  R. 419.  He found that her memory was limited as she missed three of three items after five minutes.  *Id.*  Plaintiff reported that she had become lost while in Walmart and while driving, had forgotten what she was doing when cooking food, and had forgotten to take her medications.  *Id.*  Her mood and affect were depressed and she was preoccupied with pain.  *Id.*  Plaintiff thought that her impairment was an inability to concentrate on a task.  R. 420.  Dr. Horvat said that her "illness appears to be her main stressor, and her coping ability is exhausted."  *Id.*  His diagnosis was major depressive disorder, recurrent; pain disorder; and rule out dementia not otherwise specified.  *Id.*  He assigned a current GAF score of 50 and found that Plaintiff was not capable of handling her finances.  *Id.*  Dr. Horvat concluded: "Until her levels of cognitive and memory functioning are established, it will

be difficult to determine her potential for employment or to recommend a treatment program. It should be noted that she has a severe depression." R. 420-421.

**Evidence from the administrative hearing**

Plaintiff testified at the hearing that that she had last been employed at the Dollar General Store as a cashier. R. 807-808. In that job she lifted boxes weighing about 10 pounds and supervised two or three people. R. 808-809. She testified that she performed work in other jobs requiring similar skills and functional capacity. R. 809-813.

Plaintiff said that she stopped working in 2003 because she could no longer stand on her leg after her third right knee surgery. R. 814. She tried a sedentary job as a computer technician for a couple of months but could not sit. R. 815. After that, she tried to work for Dollar General Store. *Id.*

Plaintiff said that her primary impairments are back pain, leg injury and "just being sick all the time." R. 815. She said she was not treated for Hepatitis, but for chronic pain. *Id.* She said she tried treatments for Hepatitis for two months but got PCP pneumonia, which affected her lungs, and she stopped treatments. *Id.*

Plaintiff said that she has a continuous throbbing pain in her lower back. R. 816. She takes MS Contin[21] twice a day for the pain. *Id.* She said that the severity of the pain was 8 on a scale of 10. R. 824. She said that she could not get out of bed due to

_____

[21] MS Contin, a controlled-release tablet containing morphine, is used to relieve moderate to severe pain. While regular morphine is usually given every 4 hours, MS Contin is typically taken every 12 hours – only twice a day. The Kadian brand may be taken once or twice a day. The drugs are intended for people who need a morphine painkiller for more than just a few days. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

pain on the day before the hearing. *Id.* She said that this happens several times a week. *Id.* Plaintiff also takes Zanaflex[22] when she has muscle spasms. R. 816.

Plaintiff takes insulin for diabetes. R. 817. Plaintiff said that she has neuropathy in her hands and feet sometimes, lacking sensation in them. R. 818.

Plaintiff said she takes Mirapex for restless leg syndrome. R. 818. She said that she has tremors as a side effect from this medication. *Id.*

Plaintiff said that her doctor told her to lose weight. R. 817. She said she had been trying to lose weight. *Id.* She said she tried to walk every day "all I can as long as my leg will limit it [sic]." *Id.* She said she cannot some days "because I'm in too much pain." *Id.* Her walks are about 15 to 20 minutes, just around the block. R. 818.

Plaintiff said that she thought that she could sit for an hour, but would then get up and move to stop the pain. R. 819. She said that it was "already bothering me" sitting at the hearing. *Id.* She said she could stand about 90 minutes before having to shift positions. *Id.* She said she had to move from sitting to standing. *Id.* She said that when standing, she had to be moving. R. 820. Plaintiff said that she could lift 8 pounds (a gallon of milk). *Id.*

Plaintiff said that as long as the diabetic neuropathy was not bothering her, she could use her hands for simple grasping and manipulation. R. 820. She could occasionally bend, but could not climb stairs without pain. *Id.* She could reach. *Id.*

---

[22] Zanaflex relaxes the tense, rigid muscles caused by spasticity. It is prescribed for people with multiple sclerosis, spinal cord injuries, and other disorders that produce protracted muscles spasms. PDRhealth™, PHYSICIANS DESKTOP REFERENCE.

Plaintiff said that she becomes nauseated in the morning. R. 821. She takes Phenergan for this nausea, but this made her sleepy. R. 824-825. She said she was nauseous several times a week. *Id.*

Plaintiff said that when she wakes up, she just "piddles" around the house. R. 821. She makes toast for her breakfast, but does not cook much at all. *Id.* She had stopped doing laundry. *Id.* She reads and watches television occasionally. R. 821-822. She does not vacuum. R. 822. She had a driver's license and drove a motor vehicle sometimes. *Id.* She said it was too uncomfortable to sit in a chair and use the computer. *Id.* She did no yard work. *Id.* Plaintiff said that occasionally she accompanies her husband to shop for groceries. R. 823. She went to church only occasionally due to difficulties with sitting. *Id.* She said that she was able to care for her own hygiene. *Id.* She said that she sleeps several hours during the day. R. 825.

Plaintiff said that her physician wanted to do more testing, but she could not afford to pay for the tests. R. 824. She said she was doing "everything I can as far as the testing goes." *Id.*

The Administrative Law Judge called Edward L. Griffin, M.D. (by telephone) as a witness. R. 781. Dr. Griffin is a board certified internist. *Id.* Dr. Griffin's testimony was based upon his review of the medical record. R. 781-782. He did not examine or speak to Plaintiff. R. 782.

Dr. Griffin said that because Plaintiff stopped treatment for Hepatitis C on about November 23, 2004, and there was no testing after that, it was possible that she still has "very low viral activity" or she might be "in full remission." R. 785.

Dr. Griffin thought that Plaintiff had chronic obstructive pulmonary disease, but said it was more restrictive than obstructive. R. 786. He said that the testing was valid both before and after the administration of a bronchodilator, and he thought that the results showed "predominately restrictive disease," that Plaintiff's lungs did not expand properly. R. 787. He said that this would cause fatigue and shortness of breath, and was "due to obesity." *Id.* He said that the only treatment for this condition was weight loss, 30 pounds "minimum." R. 788. Plaintiff's weight at the time of the hearing was about 180 pounds. *Id.* Dr. Griffin noted that the medical records said that Plaintiff had weighed from 202 to 212 pounds. *Id.* He saw no significant obstruction for Plaintiff's breathing. *Id.*

Dr. Griffin noted that Plaintiff also has lumbar disc disease. R. 789. He said that there was no objective evidence of radiculopathy. *Id.* He said that an MRI dated December 30, 2004, showed mild spondylosis throughout the lumbar spine, with a mild bulge at L4-L5 with some extension to the left, and a mild bulge and mild tear in the disc at L5-S1 displacing the S1 nerve root. *Id.* Dr. Griffin said that the mild spondylosis and mild disc bulging was normal for a person of Plaintiff's age, and that many people would have such findings and have "no symptoms at all." R. 790. He said that the displacement of the L1 nerve root was "the only thing that would be beyond age." *Id.*

Dr. Griffin noted that a January 4, 2006, consultative examination (by Dr. Banner) had found "minimal decrease in range of motion with flexion" of Plaintiff's spine. R. 789. He noted that Dr. Banner had found no atrophy of muscles and no objective evidence of radiculopathy, though Dr. Banner found some limited range of motion and Plaintiff's

motor strength was diminished to 3 out of 5.  *Id.*  Dr. Griffin said that without muscle

atrophy, this diminished motor strength was not considered to be an objective finding.

*Id.*  Dr. Griffin thought, therefore, that the subjective findings of decreased motor

strength were not significant.  R. 790.

Dr. Griffin noted an arthroscopic debridement of Plaintiff's right knee for a torn

meniscus on August 4, 2007, but no evidence of follow-up or physical therapy after

surgery.  R. 790.  Dr. Griffin noted that Plaintiff's treating physician said that the straight

leg raising test caused Plaintiff's right knee to hurt.  R. 791.

Dr. Griffin said that Plaintiff's "AIC" on August 13, 2007, was "very high."  R. 791.

He said that although Plaintiff was taking insulin for diabetes, the treatment notes did

not contain much information to enable him to assess limitations.  R. 791-792.  Dr.

Griffin did not see any evidence of diabetic complications, such as neuropathy.  R. 792.

Dr. Griffin said that peripheral neuropathy can be reversed "the quickest" with treatment,

but "there is simply not enough treatment information in this record for me to tell that

efforts were made to improve her AIC."  R. 804.  Thus, he was not able to say "that she

could have complications from the neuropathy that would last for 12 months."  *Id.*  He

said that while there was mention of neuropathy in the record, "there is no

documentation of any findings of the neuropathy."  *Id.*  He said that there would need to

be a physical examination, or nerve conduction studies, or both.  R. 805.

Dr. Griffin noted that Plaintiff had been treated for depression, but the clinical

data was "very, very sketchy."  R. 792.  He said that there was not enough evidence for

him "to assign A or B criteria under the listings."  *Id.*  He said that the family physician

record just mentioned depression and medications were prescribed. *Id*. Dr. Griffin did not mention the findings by Drs. O'Hearn or Horvat.

Summarizing, Dr. Griffin said that the record showed that Plaintiff was diabetic, had some chronic restrictive lung disease, had a history of Hepatitis C which was partially treated, and had some degenerative disc disease with minimal objective findings on examination, most of which was age-related. R. 792-793. Dr. Griffin said that the displaced (but not impinged) nerve at L5-S1 was moderate because there was no documentation of radiculopathy. *Id*.

Dr. Griffin was asked to consider the residual functional capacity assessment that had been assigned to Plaintiff by Plaintiff's treating physician, Dr. Akerson. R. 794-797. Dr. Griffin said that he would expect that a person with such residual functional capacity "to have Lou Gehrig's disease at end stage." R. 797. He said that such a person would be confined to a bed, if Dr. Akerson's opinion were accurate. *Id*. He found nothing in the medical evidence to support Dr. Akerson's opinion. *Id*. He said that when looking at the examinations performed by Dr. Akerson, "there is almost never any abnormality found at all." R. 798. He said that Dr. Akerson said that Plaintiff has active hepatitis C, but she had no viral titer for almost four years. *Id*. He thought that Dr. Akerson "can't say four years after an undetectable viral titer that she has active hepatitis." *Id*. He said that the results from Plaintiff's spinal MRI did not support Dr. Akerson's opinion either. *Id*.

Dr. Griffin said that there had not been much adjustment of medication for Plaintiff's depression, but there were no mental status observations in the record. R.

798. Dr. Griffin said that if Dr. Akerson saw Plaintiff "as that depressed I'm wondering why more wasn't done." R. 799.

Dr. Griffin said that he thought that Plaintiff would be capable of occasionally lifting 20 pounds, frequently lifting 10 pounds, and can stand and walk five hours out of eight, 30 minutes continuously at a time. R. 799. He said that Plaintiff's lumbar disc disease, right knee surgery, and obesity would cause the standing and walking limitations. *Id.* He thought that Plaintiff had no limitations for sitting. R. 800. He thought that she could push, pull, bend, stoop, and squat without limits. *Id.* He thought that she could occasionally crawl or kneel, climb ramps and stairs, but could not climb a ladder or scaffolding. *Id.* He found no limitations in manipulation. R. 800-801. He said that Plaintiff should avoid dust, heat, and humidity due to her restrictive lung disease. R. 801. He said that Plaintiff could work around machinery and operate equipment. R. 802.

The ALJ asked the vocational expert to consider a hypothetical person having the limitations assigned by Dr. Griffin to Plaintiff. R. 829-830. The expert said that Plaintiff could return to her job as manager at the Dollar General store as she performed it. R. 830. He said that she could also work as a motel desk clerk, automobile rental clerk, customer complaint work clerk, food checker, or telemarketer. R. 830-832.

**Legal analysis**

>    **Whether the Administrative Law Judge properly evaluated Plaintiff's
>    testimony as to the severity of her symptoms**

Plaintiff first contends that the ALJ did not properly apply the "pain and other

symptoms" standard in this circuit.  Doc. 17, p. 12.  Pain and symptoms reasonably

attributed to a medically determinable impairment are relevant evidence for determining

residual functional capacity.  Social Security Ruling 96-8p, p. 4.  Pain and other

symptoms may affect either exertional or non-exertional capacity, or both.  *Id.*, p. 6.

>    In order to establish a disability based on testimony of pain and other
>    symptoms, the claimant must satisfy two parts of a three-part test
>    showing:  (1) evidence of an underlying medical condition; and (2) either
>    (a) objective medical evidence confirming the severity of the alleged pain;
>    or (b) that the objectively determined medical condition can reasonably be
>    expected to give rise to the claimed pain.  *See Holt v. Sullivan*, 921 F.2d
>    1221, 1223 (11th Cir. 1991).  If the ALJ discredits subjective testimony, he
>    must articulate explicit and adequate reasons for doing so.  *See Hale v.
>    Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).  Failure to articulate the
>    reasons for discrediting subjective testimony requires, as a matter of law,
>    that the testimony be accepted as true.  *See Cannon v. Bowen*, 858 F.2d
>    1541, 1545 (11th Cir. 1988).

Wilson v. Barnhart, 284 F.3d 1219, 1225 (11th Cir. 2002).  The reasons articulated for

disregarding the claimant's subjective testimony must be based upon substantial

evidence.  Jones v. Department of Health and Human Services, 941 F.2d 1529, 1532

(11th Cir. 1991).  It is not necessary that the ALJ expressly identify this circuit's standard

if his findings "leave no doubt as to the appropriate result" under the law.  Landry v.

Heckler, 782 F.2d 1551, 1553-1554 (11th Cir. 1986).

"A claimant's subjective testimony supported by medical evidence that satisfies

the pain standards is itself sufficient to support a finding of disability.  Indeed, in certain

situations, pain alone can be disabling, even when its existence is unsupported by objective evidence." Foote v. Chater, 67 F.3d 1553, 1561 (11th Cir. 1995) (citations omitted). "[W]here proof of a disability is based upon subjective evidence and a credibility determination is, therefore, a critical factor in the Secretary's decision, the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Id.* at 1562, *quoting*, Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983).

The ALJ here reviewed Plaintiff's testimony. R. 16. He then set forth Dr. Griffin's testimony. R. 16-17. He noted the restrictions found by Dr. Akerson, Plaintiff's treating physician. R. 17-18. The ALJ then again summarized Plaintiff's testimony, finding that she had asserted that she could stand and sit for "for at least an hour at a time." R. 18. He accurately reviewed the findings of Dr. Chintanadilok from the hospital visit on August 8, 2007. R. 18. Relying on the testimony of Dr. Griffin, the ALJ found that "there was nothing in the medical evidence to support the restrictions and limitations indicated by [Dr. Akerson]." *Id.* The ALJ incorporated Dr. Griffin's findings "in the established residual functional capacity." R. 19. The ALJ then determined that the symptoms described by Plaintiff were not credible to the extent inconsistent with this residual functional capacity. *Id.*

This reasoning adequately applied this circuit's legal standard and the conclusion is based upon substantial evidence in the record. The ALJ's reasoning is the reasoning of Dr. Griffin, which he adopted. Dr. Griffin's reasoning is supported by substantial evidence in the record. As explained by Dr. Griffin, the examinations by Dr. Banner and

the spinal MRI revealed no muscle atrophy, no radiculopathy, essentially no range of

motion limitations (except right knee limitations consistent with the prior surgeries), and

no serious spinal abnormalities. There is also substantial evidence in the record that

Plaintiff's shortness of breath is restrictive rather than obstructive, and that she has

shortness of breath and limitations of movement due to obesity. There is recent

evidence that Plaintiff lost about 20 to 30 pounds, which would indicate that she is

capable of losing weight. The extent to which Plaintiff's Hepatitis C condition causes

limitations is not sufficiently in evidence since there has been no more testing for that

condition. Perhaps Plaintiff's Hepatitis C causes shortness of breath, chest pain, and

fatigue, but Dr. Akerson made no objective findings to support such a medical

conclusion and did not express that opinion, and no other medical expert expressed any

such opinion based upon objective evidence. Plaintiff's diabetes was sometimes

uncontrolled, but Dr. Akerson did not routinely record blood sugar values, so the extent

of inability to control diabetes is unknown and there is no objective evidence that

Plaintiff has had diabetic neuropathy lasting more than 12 months. Further, as Dr.

Griffin said, that condition can be reversed if diabetes is controlled. This first argument,

that the ALJ failed to give reasons supported by substantial evidence to discount

Plaintiff's testimony about the extent of her impairments, is not persuasive.

**Whether the ALJ erred in failing to find that Plaintiff's depression is a "severe" impairment at step 2**

Plaintiff contends that the ALJ should have found that her depression is a

"severe" impairment. Doc. 17, p. 16. At step 2, the issue is whether Plaintiff has shown

that she has a condition which has more than "a minimal effect on her ability to: walk,

stand, sit, lift, push, pull, reach, carry, or handle, etc." Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying on 20 C.F.R. § 404.1521). "In other words, the 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), citing Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274. "Step two is a threshold inquiry. It allows only claims based on the most trivial impairments to be rejected. The claimant's burden at step two is mild." McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady). A "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them from working." Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), quoting Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985). It also has been characterized by the Supreme Court as a criterion which identifies "at an early stage those claimants whose medical impairments are so slight that it is unlikely they would be found to be disabled even if their age, education and experience were taken into consideration." Stratton, 827 F.2d at 1452 n. 9 (emphasis by the court), quoting Bowen v. Yuckert, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

An erroneous finding as to "severe" impairments at step 2 may improperly

foreclose a claimant's "ability to demonstrate the merits of her claim for disability with

respect to her former work activities." Flynn, 768 F.2d at 1275. Impairments must be

evaluated in combination at all stages of the analysis. 20 C.F.R. §§ 404.1523 and

416.923; Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990); Swindle v. Sullivan,

914 F.2d 222, 226 (11th Cir. 1990); Davis v. Shalala, 985 F.2d 528, 534 (11th Cir.

1993). Impairments must be evaluated in combination even though some impairments

are not severe. Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir. 1985). The

Eleventh Circuit has "repeatedly held that an ALJ must make specific and well-

articulated findings as to the effect of the combination of impairments when determining

whether an individual is disabled." Davis v. Shalala, 985 F.2d at 534.

The ALJ erred as to this issue. Plaintiff was twice assigned a current GAF score

of 50 by mental health experts. That score is on the borderline between serious and

moderate impairments, and is substantial evidence that her depression causes more

than a minimal effect upon Plaintiff's ability to work.

Further, neither Dr. Griffin nor the ALJ discussed the assessments by Dr.

O'Hearn or Dr. Horvat. In 2004, Dr. O'Hearn observed that Plaintiff walked with a

noticeable limp, moved slowly, spoke haltingly, and was short of breath. R. 658. She

found that Plaintiff's mood was depressed and lethargic. *Id.* After testing, Dr. O'Hearn

found that Plaintiff's immediate short term memory and her capacity for abstract thinking

were only fair. *Id.* Dr. O'Hearn concluded that Plaintiff's depression and anxiety

appeared to be "largely secondary to serious medical problems and pain," and that her

physician would have to assess her medical complaints.  R. 659.  Dr. O'Hearn's

diagnosis was major depressive disorder, severe, without psychotic features, and

anxiety disorder, NOS.  *Id.*

In 2008, Dr. Horvat found on examination that Plaintiff's attention was distractible

and her anxiety "interfered with her concentration."  R. 419.  He found that her memory

was limited as she had missed three of three items after five minutes.  *Id.*  Plaintiff

reported that she had become lost while in Walmart and while driving, had forgotten

what she was doing when cooking food, and had forgotten to take her medications.  *Id.*

He found that her mood and affect were depressed, and that she was preoccupied with

pain.  *Id.*  Dr. Horvat's diagnosis was major depressive disorder, recurrent; pain

disorder; and rule out dementia not otherwise specified.  R. 420.  He assigned a current

GAF score of 50, again indicative of serious mental health issues, and found that

Plaintiff was not capable of handling her finances.  *Id.*  Dr. Horvat was unsure, however,

as to the extent of Plaintiff's disability as he concluded:

> Until her levels of cognitive and memory functioning are established, it will
> be difficult to determine her potential for employment or to recommend a
> treatment program.  It should be noted that she has a severe depression.

R. 420-421.

The ALJ erred, therefore, by not finding that Plaintiff has the "severe" impairment

of depression.  As a consequence, that impairment dropped out of the analysis.  A

remand is needed.  On remand, the ALJ should obtain another consultative mental

status examination of Plaintiff, and should gather additional mental health records, if

they exist, and then reconsider Plaintiff's mental impairments in combination with her physical impairments.

**Whether the ALJ properly discounted the opinion of the treating physician**

Plaintiff argues that the ALJ erred in discounting the opinion of Dr. Akerson, Plaintiff's treating physician.  Doc. 17, p. 17.  The reasons for giving little weight to the opinion of a treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated.  Phillips v. Barnhart, 357 F.3d 1232, 1241 (11th Cir. 2004).  "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error."  MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986).

As noted above, the ALJ rejected the opinion of Dr. Akerson in favor of Dr. Griffin's analysis of the medical records, and he incorporated into his own findings the discussion by Dr. Griffin.  This satisfies the Eleventh Circuit's rules for discussing the opinions of a treating physician.

Plaintiff's mental capacity, however, is a different matter.  The ALJ erred in failing to discuss the mental incapacity evidence mentioned above, and Dr. Griffin's findings are insufficient as well because he did not mention the evidence from Drs. O'Hearn and Horvat.  Further, Dr. Akerson's own assessment of Plaintiff's mental residual functional capacity is consistent with the findings of Drs. O'Hearn and Horvat.  A remand is recommended to provide another opportunity for reconsideration of Dr. Akerson's mental health conclusions.

**Conclusion**

In summary, the ALJ's reasoning with regard to Plaintiff's residual functional capacity from a physical perspective should be affirmed.  A remand is needed to clearly determine the extent of Plaintiff's mental health impairments.  Once that is known, Plaintiff's mental health status should be considered in combination with her physical ailments.

Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED** with respect to the Commissioner's conclusions regarding whether Plaintiff is disabled considering only her physical impairments, but **REVERSED** as to Plaintiff's mental impairments, and the case be **REMANDED** so that the Commissioner may reconsider the evidence of Plaintiff's mental impairments and then consider those impairments in combination with her physical impairments.

**IN CHAMBERS** at Tallahassee, Florida, on June 9, 2010.


s/     **William C. Sherrill, Jr.**
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**


**NOTICE TO THE PARTIES**

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 5:09cv311-RS/WCS